UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ANTHONY WINKEL,

                    Plaintiff,

        v.                                                    CAUSE NO. 3:20-CV-715 DRL

KILOLO KIJAKAZI,
Acting Commissioner of the Social Security
Administration,

                    Defendant.

OPINION & ORDER

Anthony Winkel appeals from the Social Security Commissioner's final judgment denying disability insurance benefits. Mr. Winkel requests either reversal of the Commissioner's decision or remand of his claim for further consideration. Having reviewed the underlying record and the parties' arguments, the court remands the Commissioner's decision.

BACKGROUND

Mr. Winkel "suffers vision and short-term memory deficits, as well as anxiety and depression, as a result of [a] stroke" [R. 15]. Mr. Winkel filed an application for disability on June 28, 2017, alleging a disability onset date of November 4, 2016 [R. 10]. Mr. Winkel was 49 years old on the alleged onset date [R. 18]. He has a high school education and previous work experience as a construction worker and construction supervisor [*id*].

Mr. Winkel's application was denied initially and again on reconsideration [R. 10]. He appealed that decision to an Administrative Law Judge (ALJ), Jeanette Schrand, and a hearing was held on January 18, 2019 [R. 9-10]. In a June 21, 2019 decision, the ALJ denied Mr. Winkel's petition on the basis that there were sufficient jobs available in the national economy that he could perform considering his age, education, work experience, and residual functioning capacity (RFC) [R. 18-20].

Mr. Winkel challenged the decision by filing a request for review with the Appeals Council. After the Council denied his request on June 26, 2020, [R. 1-5], Mr. Winkel filed an appeal here.

STANDARD

The court has authority to review the Appeal Council's decision under 42 U.S.C. § 405(g). Because the Appeal Council denied review, the court evaluates the ALJ's decision as the Commissioner's final word. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). The ALJ's findings, if supported by substantial evidence, are conclusive and nonreviewable. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence is that evidence which "a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971), and may well be less than a preponderance of the evidence, *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Richardson*, 402 U.S. at 401). If the ALJ has relied on reasonable evidence and built an "accurate and logical bridge between the evidence and [the] conclusion," the decision must stand. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Even if "reasonable minds could differ" concerning the ALJ's decision, the court must affirm if the decision has adequate support. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)).

DISCUSSION

When considering a claimant's eligibility for disability benefits, an ALJ must apply the standard five-step analysis: (1) is the claimant currently employed; (2) is the claimant's impairment or combination of impairments severe; (3) do his impairments meet or exceed any of the specific impairments listed that the Secretary acknowledges to be so severe as to be conclusively disabling; (4) if the impairment has not been listed as conclusively disabling, given the claimant's residual function capacity, is the claimant unable to perform his former occupation; (5) is the claimant unable to perform any other work in the national economy given his age, education, and work experience. 20 C.F.R. § 404.1520; *Young v. Sec'y of Health & Hum. Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears

the burden of proof until step five, when the burden shifts to the Commissioner to prove that the claimant can perform work in the economy. *See Young*, 957 F.2d at 389.

The ALJ concluded that Mr. Winkel had the residual functional capacity (RFC) to perform light work [R. 14]. Because he had additional non-exertional limitations that could impact his ability to do light work, the ALJ asked a vocational expert to determine whether jobs existed in the national economy that Mr. Winkel could perform. The vocational expert concluded that there were 251,000 jobs available nationally as an inspector hand packager (120,000), a laundry classifier (86,000), or a mail clerk (45,000) [R. 19]. Based on this testimony, the ALJ concluded that Mr. Winkel was not disabled [R. 20].

Mr. Winkel challenges this conclusion, advancing four arguments: (1) the ALJ failed to build an accurate and logical bridge between the evidence and her conclusion, (2) the ALJ misapplied the Medical-Vocational Guidelines, (3) the ALJ erred by not accounting for the claimant's moderate limitation in concentration, persistence, and pace, and (4) the ALJ erred by only considering jobs available nationally.

A.    *Although the ALJ Ably Performed a Review in Many Areas, the ALJ Erred in Addressing Dr. Gary Elliott's Neurocognitive Evaluation of Mr. Winkel.*

Mr. Winkel argues that the ALJ didn't build an accurate and logical bridge between the evidence and her conclusion because she mischaracterized evidence, cherry-picked evidence that supported her conclusion, and ignored lines of evidence that were contrary to her conclusion. Much of what the ALJ wrestled to the ground on this record was capably done; however, the ALJ erred in addressing the medical opinion from Dr. Gary Elliott.[1] Thus, the ALJ's conclusion regarding the claimant's RFC isn't supported by substantial evidence.

---

[1] The government argues that Dr. Elliott's original neuropsychological evaluation isn't a "medical opinion," citing 20 C.F.R. § 404.1513(a)(2). Even so, Dr. Elliott later provided a medical opinion [R. 680-81] that relied on the original neuropsychological evaluation. Because the ALJ was required to address the supportability of that opinion, *see* 20 C.F.R. § 404.1527(c)(3), the ALJ was required to assess the underlying evaluation.

An ALJ is required "to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). While "an ALJ need not mention every piece of evidence, *id.*," she is required to "confront the evidence in [the claimant's] favor and explain why it was rejected." *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016).

Mr. Winkel first challenges the ALJ's finding that his "mood and affect [were] appropriate" [R. 17] because she relied on doctor reports that did not address his mood and overlooked statements that Mr. Winkel was agitated. Mr. Winkel is correct that the ALJ cited doctor examination notes that don't seemingly discuss his mood and affect [R. 16-17, 609]. However, he does not show that the ALJ acted unreasonably when she relied on a 2017 consultative examination report and 2018 office treatment record to find that Mr. Winkel's "mood and affect [were] appropriate." In the consultative examination report, for instance, the doctor concluded: "[m]ental status reveals that the patient is alert and oriented times three, is appropriate and responds to questions, and appears to be of normal intelligence" [R. 645]. Although Mr. Winkel is correct that a doctor characterized his mood as agitated in the 2018 office treatment record, the doctor also wrote "affect congruent, good grooming and eye contact, thought content logical and linear" [R. 668].[2] These latter two reports support the ALJ's conclusion that Mr. Winkel's "mood and affect [were] appropriate" [R. 17].

Mr. Winkel next argues that the ALJ mischaracterized the evidence by confusing visual acuity and visual field causing her to dismiss his visual field limitations. The ALJ didn't just rely on Mr. Winkel's visual acuity to support her finding that his vision limitations don't "make him unable to sustain employment" [R. 17]. She cited the fact that Mr. Winkel was "cleared to drive following occupational therapy" and that the recommended treatment from his doctor was "annual monitoring"

---

[2] The Oxford Concise Medical Dictionary defines "incongruent affect" as "an inappropriate emotional response to a situation." *Affect*, *Oxford Concise Medical Dictionary* (9th ed. 2015). Because Mr. Winkel's affect was "congruent," he seems to have been exhibiting appropriate emotional responses to the situation.

[*id.*]. Furthermore, Mr. Winkel cites today no contrary evidence that his visual field deficit rendered him unable to sustain employment. The ALJ also incorporated Mr. Winkel's visual field deficit later in her evaluation when she asked the vocational expert to base her testimony on a hypothetical person who "cannot perform work that requires peripheral vision on the left side" [R. 72]. There was no error here.

Mr. Winkel's third argument centers on Dr. Gary Elliott's neuropsychological evaluation. Mr. Winkel argues that the ALJ's decision wasn't supported by substantial evidence because she ignored Dr. Elliott's report. Furthermore, Mr. Winkel argues that the ALJ didn't afford Mr. Elliott's report the proper weight under 20 C.F.R. § 404.1520c.

Mr. Winkel argues that the ALJ ignored evidence of his mental health, citing *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) ("although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling") (citations omitted). *Golembiewski*, however, is factually different. In *Golembiewski*, the court found that the ALJ erred because he "entirely failed to discuss [the claimant's] bowel and bladder dysfunction," his "decision contain[ed] no discussion of [the claimant's] limited ability to bend on account of his bad back," and he "ignored" evidence of the claimant's "propensity to drop objects." *Id.* at 917-18. The ALJ here never ignored Dr. Elliott's evaluation. She discussed Dr. Elliott's examination specifically and explained why it was unpersuasive; and additionally analyzed the medical issue underlying Dr. Elliott's report—namely, Mr. Winkel's mental state [R. 15-18]. Unlike *Golembiewski*, the ALJ didn't entirely ignore a medical condition.

Although the ALJ discussed Dr. Elliott's report, she did not properly explain why it was outweighed by other evidence. ALJs do "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including

those from [the claimant's] medical sources" for claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c.

> "The factors of supportability . . . and consistency . . . are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency for a medical source's medical opinions or prior administrative medical findings in your determination or decision."

*Id.* ALJs "may, but are not required to, explain how" the other factors of 20 C.F.R. § 404.1520c are considered in their decision. *Id.*

Under this new paradigm, an ALJ must consider all medical opinions based on a host of factors, including supportability, consistency, specialization, relationship with the claimant, and other factors. *See* 20 C.F.R. § 404.1520c(b), (c). Although the ALJ must consider all these factors, she "need only explain how she considered supportability and consistency." *Rogers v. Saul*, 2021 U.S. Dist. LEXIS 85593, 11 (N.D. Ind. May 5, 2021); *see also* 20 C.F.R. § 404.1520c(b)(2). Failure to do so requires remand. *Tammy M. v. Saul*, 2021 U.S. Dist. LEXIS 112293, 24 (N.D. Ind. June 16, 2021). For a provider's opinion to be supportable, it must be based on "objective medical evidence and supporting explanations." 20 C.F.R. § 404.1520c(c)(1). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

In June 2018, Dr. Elliott evaluated Mr. Winkel to determine his neurocognitive strengths and weakness given his stroke [R. 675-79]. Mr. Winkel complained of short-term memory loss and below average ability to concentrate. He described his condition as variable. Dr. Elliott spoke with Mr. Winkel and his spouse. He reviewed Dr. Callaghan's extensive medical notes that identified his subacute infarct and another small acute lacunar infarct.

Dr. Elliott also conducted numerous tests. He conducted a temporal orientation test on which Mr. Winkel scored "borderline." The doctor performed an RCFT (Rey complex figure test), a test that measures recognition memory and assesses potential causes of memory deficits. Mr. Winkel "encountered difficulty" here. He had "planning difficulty" with a moderate distortion of the global "gestalt" such that "his raw score fell only between the 2-5th percentile" [R. 677]. Dr. Elliott tested his intellectual assessment through the Shipley-II. He scored "low average" on abstraction and composite scores, and "average" on vocabulary—scores that reflected "globally satisfactory and stable intellectual functioning" because abstraction and vocabulary weren't significantly off-par with each other [*id.*]. Mr. Winkel performed "unexpectedly well (90th percentile) on the CET, an abstract reasoning task [that] assesses one's ability to formulate plausible cognitive estimates" [*id.*]. Other tests were of more concern. Dr. Elliott performed other testing—the RBANS, SDMT, TMT, MVCT, SNST, FPT, BDI-II, and BAI—tests that further assessed memory, auditory attention span, information processing speed, visual spatial sequencing, anxiety, and other neuropsychological conditions [R. 677-78].

Dr. Elliott concluded that the tests were "not definitive" but suggested "globally moderate neurocognitive impairment" [R. 679]. Mr. Winkel had borderline impairment in one area, but moderate to marked impairment in numerous areas of neurocognitive functioning [*id.*]. This was on top of severe depression and moderate-severe anxiety as revealed from the test results [R. 678]. Dr. Elliott opined that Mr. Winkel's "physical and cognitive deficits are likely a direct result of the stroke as well as indirect psychological sequelae" (a condition from a previous injury) [R. 679]. Dr. Elliott recommended consideration of medications and counseling [*id.*].

Dr. Elliott's medical opinion indicated that Mr. Winkel's ability to understand, remember, and carry out instructions were affected by his impairment [R. 680]. He identified moderate limitations in certain areas of function and marked limitations in other areas [R. 680-81]. In identifying the medical

or clinical findings that supported these assessments, Dr. Elliott cited the results of his neuropsychological testing, patient examination, and result of an occupational therapy assessment [R. 681].

The ALJ referenced Dr. Elliott's evaluation [R. 17-18]. She characterized his evaluation as one showing "moderate neurocognitive impairments secondary to [Mr. Winkel's] stroke"—a mischaracterization of the breadth of Dr. Elliott's findings, which included both moderate and marked limitations in neuropsychological functioning. She dismissed his report of a panoply of testing with the fairly cursory explanation that his medical report lacked any "functional limitations as to the claimant's ability to work" [R. 18]. In addition, the ALJ concluded that the "overall medical evidence does not mention significant limitations or concerns in [the] area" of memory [R. 17], though Dr. Elliott in fact noted "marked" limitations in Mr. Winkel's ability to understand, remember, and carry out "detailed instructions," whereas only "moderate" limitations with simply instructions or simple work-related decisions [R. 680].

A moderate limitation alone would not as a rule necessitate a different finding. "A 'moderate limitation' is defined by regulation to mean that functioning in that area is 'fair,'" not something "bad" or "inadequate." *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021); *accord Lothridge v. Saul*, 984 F.3d 1227, 1234 (7th Cir. 2021); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00F2c. The government offers no defense why marked limitations weren't appropriate for consideration.

The ALJ later noted that Dr. Elliott had identified both marked and moderate limitations— marked as to detailed instructions—but concluded that his opinion was "unpersuasive, as it is inconsistent with the medical evidence of record" [R. 18]. The ALJ addressed consistency by saying that other "consultative examinations reported the claimant was alert and oriented, vigilant, was appropriate and responded to questions, appeared to be of normal intelligence, and did not demonstrate significant functional deficits in these areas" [*id.*].

8

First, the ALJ never explains why alertness, vigilance, or the appearance of normal intelligence in the course of a disability evaluation proves inconsistent with a marked limitation in a patient's ability to understand and remember detailed instructions (as opposed to simple ones) based on substantial neuropsychological testing. That is no less true when one of the ALJ's cited reports on this very point—a psychological evaluation from Dr. Chad Edwards on September 27, 2017 [R. 18, 648-650]—concluded, based on data collected during the evaluation and clinical observation, that Mr. Winkel "is likely to experience significant difficulties with aspects of both simple and complex employment, ranging from social interactions, memory, and learning new tasks" [R. 650]. Dr. Edwards concluded that Mr. Winkel had a major neurocognitive disorder due to stroke (among other disorders) and recommended memory testing [*id.*]—testing that Dr. Elliott indeed performed. The abutments to this logical bridge thus don't support the ALJ's conclusion. *See Thomas*, 826 F.3d at 961. The ALJ's citation undercut, not supported, her conclusion. The government argues that further analysis by the ALJ of Dr. Edwards' opinion wouldn't have changed the result, but this isn't so when Dr. Edwards' findings lined up with those of Dr. Elliott.

Second, the ALJ never addressed supportability. No discussion ensued about Dr. Elliott's medical evidence or supporting explanations. 20 C.F.R. § 404.1520c(c)(1). The decision is silent on this front. This too requires remand. *See Tammy M.*, 2021 U.S. Dist. LEXIS 112293 at 24. The court cannot say on this record that the ALJ's conclusion was supported by substantial evidence.

Contrary to the government's position, this error isn't harmless. *See also infra* Section C. On remand, the ALJ must reevaluate Dr. Elliott's opinion in crafting an RFC determination and hypotheticals for the vocational expert that adequately account for Mr. Winkel's limitations.

B.   *The ALJ Properly Considered Mr. Winkel's Exertional and Non-Exertional Limitations Under the Medical-Vocational Guidelines.*

Mr. Winkel argues that the ALJ failed to follow the Medical-Vocational Guidelines because she did not thoroughly assess the extent to which his non-exertional limitations eroded his

occupational base as required by SSR 83-14. He further argues that the Medical-Vocational Guidelines directed a finding of disability because his remaining occupational base following erosion was closer in number to that of the sedentary table.

At step five of the sequential analysis, an ALJ must determine "whether the person can do any other work that exists in the national or regional economy." *Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005) (citing 20 C.F.R. §§ 404.1520(a)(4)(v), (e); 20 C.F.R. §§ 416.920(a)(4)(v), (e)). "To this end, the ALJ may use the [Medical-Vocational Guidelines]," known as the "grids," "to determine whether other jobs exist in the national or regional economy that a claimant can perform." *Id.* The ALJ should be able to line up a claimant's limitations and vocational factors in the appropriate grid table and discern a finding of disabled or not disabled. *See Haynes v. Barnhart*, 416 F.3d 621, 627-28 (7th Cir. 2005).

"The grids, however, generally take account only of exertional impairments." *Fast*, 397 F.3d at 470. When a claimant has non-exertional limitations imposed by a medically determinable impairment, the grids don't direct a conclusion of "disabled" or "not disabled." *See id*; *Haynes*, 416 F.3d at 628 ("Appendix 2 clearly envisions cases . . . in which the claimant has a 'hybrid' RFC, and does not mandate the use of the grids in such cases."); *Stanley v. Astrue*, 410 F. Appx. 974, 976 (7th Cir. 2011) ("When a claimant has both exertional and non-exertional limitations, the Guidelines do not specify an outcome, so the policy statements require the ALJ to use the Guidelines as a 'framework' for the decision."). Instead, the grids are used "in conjunction with the definitions and discussions provided in the text of the regulations, as framework for decisionmaking." SSR 83-14, 1983 SSR LEXIS 33 at 1; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e)(2). "Where an individual's exertional RFC does not coincide with the definition of any one of the ranges of work as defined [by the regulations], the occupational base is affected and may or may not represent a significant number of jobs in terms of the rules directing a conclusion as to disability." SSR 83-12, 1983 SSR LEXIS 32 at 3. In that case,

the ALJ will consider the extent of any erosion of the occupational base and assess its significance. *See id.* "Where the adjudicator does not have a clear understanding of the effects of additional limitations on the job base, the services of a [vocational specialist] will be necessary." SSR 83-14, 1983 SSR LEXIS 33 at 17.

The ALJ found Mr. Winkel capable of light work as defined in 20 C.F.R. §§ 404.1567, but acknowledged that he had additional limitations that may erode this occupational base [R. 14]. Specifically, the ALJ explained that Mr. Winkel was "limited to being able to understand, remember, and carry out work that consists of only simple and routine tasks," "limited to work that requires no more than occasional interaction with the public," limited to work requiring "only occasional depth perception," and prevented from work that required "peripheral vision on the left side" [R. 71-72]. Because of these non-exertional limitations, the ALJ could not definitively say Mr. Winkel was disabled or not disabled based on the grids alone [R. 19]. Therefore, the ALJ consulted a vocational expert to determine the extent to which Mr. Winkel's additional limitations eroded the light unskilled operational base [*id.*].

In questioning the vocational expert, the ALJ posed a hypothetical in which a person with Mr. Winkel's limitations was only able to perform light work [R. 71]. Considering this hypothetical, the vocational expert concluded that there were 251,000 jobs available nationally—120,000 jobs as an inspector and hand packager, 86,000 jobs as a laundry classifier, and 45,000 jobs as a mail clerk [R. 72]. This testimony formed the foundation of the ALJ's conclusion that there were significant jobs in the national economy that Mr. Winkel could perform [R. 20].

Mr. Winkel argues that the ALJ erred by not explicitly examining the extent to which his occupational base was eroded by his limitations. An ALJ isn't required to perform this analysis when she has otherwise found that there are significant jobs that a claimant can perform in the national economy. *See, e.g.*, *Boone v. Barnhart*, 353 F.3d 203, 210 (3d Cir. 2003) (reversal not mandated "whenever

the ALJ does not set out specific findings concerning the erosion of the occupational base if, as here, the ALJ has received the assistance of a VE in considering the more precise question whether there are a significant number of jobs in the economy that the claimant can perform"); *Haynes*, 416 F.3d at 629-30 (ALJ's reliance on vocational expert's testimony was reasonable when "the ALJ's hypothetical question incorporated [the claimant's] limitations as reflected at length in the record.").

Mr. Winkel contests further that the ALJ should have evaluated the erosion of his occupational base because he is over age 50. In making a disability determination, ALJs "consider [the claimant's] chronological age in combination with [the claimant's] residual functional capacity, education, and work experience." 20 C.F.R. § 404.1563. When a claimant is under 50 years old, ALJs "do not consider that [the claimant's] age will seriously affect [his] ability to adjust to other work." *Id.* When a claimant is between 50 and 54, he is categorized as "closely approaching advanced age," and ALJs "consider that [his] age along with a severe impairment(s) and limited work experience may seriously affect [his] ability to adjust to other work." *Id.* Age is not "mechanically" applied in a borderline situation, and if a claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that [he is] disabled, [ALJs] will consider whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case." *Id.*

In this case, Mr. Winkel was forty-nine at the alleged disability onset date on November 4, 2016 [R. 12, 18]. He was three months from his fiftieth birthday on February 7, 2017 [R. 18]. The ALJ determined that Mr. Winkel was capable of performing light work subject to additional limitations. Whether Mr. Winkel was classified as "closely approaching advanced age" or as a "younger individual," the grids for "light work" do not dictate that he is disabled either way. *Compare* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.20 *with* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.13. Should the ALJ have concluded that Mr. Winkel was only capable of sedentary work, his disability status in the "closely

approaching advanced age" category would depend upon whether his skills were transferable or not, *compare* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.15 *with* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.14, which the ALJ found not to be material to her determination [R. 18]. Given the myriad ways in which Mr. Winkel's age could be applied to the grids, it is not clear that the claimant would be obviously disabled should the ALJ have found him "closely approaching advanced age." The ALJ acted reasonably because she had the discretion to decide "whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case." 20 C.F.R. § 404.1563(b).

The ALJ was not required to compare the sedentary and light work grids, as Mr. Winkel argues. This line of reasoning has already been rejected in this circuit. *See Stanley*, 410 F. Appx. at 977 ("Here, the ALJ correctly determined that the Guidelines did not dictate a result, obtained testimony from a vocational expert specifying that Stanley could perform over 26,000 jobs in several occupations, and permissibly concluded that the number of jobs available to Stanley was 'significant.'"); *see also Haynes*, 416 F.3d at 629 ("The regulations and abundant caselaw clearly indicate that [when the claimant's RFC does not coincide with the full range of either sedentary or light work] it is appropriate to consult with a vocational expert[.]").

Because of Mr. Winkel's non-exertional limitations, the Medical-Vocational Guidelines were only to be used as a "framework." *See Stanley*, 410 F. Appx. at 976. Otherwise, the ALJ was entitled to rely on the testimony of a vocational expert in making her disability determination. The ALJ appropriately applied the framework of the grids by incorporating Mr. Winkel's limitations into the hypothetical posed to the vocational expert. No error occurred here.

C.     *The ALJ Didn't Properly Account for Mr. Winkel's Moderate Limitations in Pace, Persistence, and Concentration.*

Mr. Winkel next argues that the ALJ did not properly account for his moderate limitations in concentration, persistence, or pace (CPP) limitations in her RFC assessment and erred when she

instructed the vocational expert to consider a hypothetical worker who is only capable of performing "simple and routine tasks" because the phrase does not properly account for the CPP limitations.

The ALJ decided that Mr. Winkel has a moderate limitation "[w]ith regard to concentrating, persisting, or maintaining pace" [R. 14]. This led the ALJ to conclude that Mr. Winkel would be "limited to simple, routine tasks due to indications of memory deficits" [R. 17]. The ALJ attempted to incorporate Mr. Winkel's limitation "with regard to concentrating, persisting, or maintaining pace" into her analysis by asking the vocational expert, in determining the number of jobs available in the national economy, to consider a hypothetical person who was "limited to being able to understand, remember, and carry out work that consists of only simple and routine tasks" [R. 71].

When an ALJ finds that the claimant has CPP limitations, they must be accounted for in both the RFC and the vocational expert's hypothetical. *See Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019) ("both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record, including even moderate limitations in concentration, persistence, or pace") (internal quotations omitted). Although "an ALJ need not use any 'magic words' in an RFC Assessment," *Webber v. Kijakazi*, 2021 U.S. App. LEXIS 24776, 15 (7th Cir. Aug. 19, 2021), it "must say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations," *Lothridge*, 984 F.3d at 1233. "[O]bserving that a person can perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift." *Crump*, 932 F.3d at 570. By including CPP limitations in the hypothetical, the ALJ can "ensure that the [vocational expert] is apprised fully of the claimant's limitations so that the [expert] can exclude those jobs that the claimant would be unable to perform." *Id.* (internal quotations omitted).

When a claimant has CPP limitations, the RFC assessment is not based on substantial evidence if the ALJ fails to address whether the claimant is "capable of performing work at a sustained pace

over an entire workday." *Lothridge*, 984 F.3d at 1233. Even if the vocational expert provides testimony regarding employees' tolerance for time off-task and unplanned leave, the ALJ errs when she does not consider such testimony in the RFC determination. *See Crump*, 932 F.3d at 570 (finding that the ALJ erred by not incorporating the vocational expert's testimony regarding time off-task and unplanned leave in the RFC determination); *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) (holding that the ALJ erred by not discussing the vocational expert's testimony that "an individual who would either be off task 20% of the workday or would have two unscheduled absences per month" could not sustain employment). An RFC assessment that does not expressly discuss CPP limitations can be overcome by an "extensive narrative" of job searches, recreational activities, and work performance resulting in an express finding that the claimant "would not be absent or off-task in excess of what would be tolerated." *Webber*, 2021 U.S. App. LEXIS 24776 at 15-16.

In this case, the ALJ's RFC assessment was not supported by substantial evidence because the ALJ's opinion did not "say enough to enable a review of whether the ALJ considered the totality of [the] claimant's limitations." *Lothridge*, 984 F.3d at 1233. The ALJ found that Mr. Winkel had a moderate CPP limitation [R. 14]. This fact wasn't discussed any further. Without more analysis in the opinion, it is impossible to evaluate whether the ALJ appropriately considered Mr. Winkel's CPP limitations.  The ALJ's opinion doesn't discuss whether or how the CPP limitations might impact Mr. Winkel's ability to sustain performance over an eight-hour workday. The ALJ questioned the vocational expert about "an employer's tolerance for time off task beyond regularly scheduled breaks" and "absences," but did not discuss if or how the vocational expert's answers factored into her decision [R. 73-74]. Presumably, the ALJ had a percentage of the day in mind that Mr. Winkel would spend off-task; but, without discussing this further in her opinion, the record does not demonstrate how it factored into her decision.

At one point in her opinion, the ALJ qualified Mr. Winkel's CPP limitations by reporting that he was "able to complete serial threes in under 20 seconds with zero errors and he was able to complete mental calculations" [R. 14]. It is unclear whether this fact convinced the ALJ to discard his limitation entirely. Whatever role this factor did play in the ALJ's opinion, "[w]hether [a claimant] is . . . able to add sums in a short-term encounter or examination has little or no apparent bearing on whether she can maintain pace or stay on task for an entire workday." *Lothridge*, 984 F.3d at 1233.

Turning now to the hypothetical posed to the vocational expert, when an ALJ only prompts the vocational expert to limit their job projections to "simple and routine tasks," more information is required to ensure that the vocational expert has an accurate understanding of the claimant's limitations. *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010) ("In most cases, however, employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace."). For example, the ALJ can improve the vocational expert's understanding of a claimant's limitations by providing a hypothetical that "excluded positions likely to trigger symptoms of the panic disorder that lay at the root of [a] claimant's" CPP limitations, or restricting the hypothetical "to low-stress, low-production work when the claimant's difficulties with concentration, persistence and pace arose from stress-induced headaches, frustration and anger." *Id.* at 619 (citations omitted). Alternately, a reference to "simple and routine tasks" in the hypothetical may be sufficient "when the record shows that the [vocational expert] independently reviewed the medical record or heard testimony directly addressing those limitations." *Id.* at 619.

The ALJ's hypothetical, in this case, did not provide enough detail to "ensure that the [vocational expert was] apprised fully of the claimant's limitations." *Crump*, 932 F.3d at 570 (internal quotations omitted). The ALJ only instructed the vocational expert to consider a hypothetical person who was "limited to being able to understand, remember, and carry out work that consists of only

simple and routine tasks" [R. 71]. The ALJ did not provide any further details to the vocational expert that would have oriented her to the underlying cause of Mr. Winkel's CPP limitations (or those from Drs. Elliott and Edwards).

The ambiguous hypothetical may have been saved if it were clear that the vocational expert had reviewed the medical record or heard sufficient medical testimony to understand the claimant's CPP limitations. The vocational expert said that she had "sufficient information to render an opinion about the Claimant's past work" based on a review of a record provided to her and the testimony that she heard [R. 70]. It is unclear what information was in the "record" provided to the vocational expert prior to her testimony, whether it contained medical information, and whether it was enough to provide the vocational expert with an accurate understanding of Mr. Winkel's limitations. Additionally, the vocational expert did not hear medical testimony during the hearing when the only people to testify were Mr. Winkel and his spouse [R. 37-38, 64]. Remand proves inevitable then.

D.    *The ALJ Reasonably Relied on Testimony of Available Jobs in the National Economy.*

The scope of vocational expert testimony may change on remand, but the court addresses this next issue because it may impact remand efforts. Mr. Winkel argues that the ALJ erred when she found there was a significant number of jobs available in the national economy that Mr. Winkel could perform. Specifically, he argues that the ALJ is required to include "a statement of the incidence of such work in the region in which the individual resides or in several regions of the country." SSR 83-12, 1983 SSR LEXIS 32 at 12.

During the vocational expert's testimony, the ALJ asked the vocational expert to report the "jobs that exist in the national economy" that a hypothetical person with Mr. Winkel's limitations could perform [R. 72]. The vocational expert provided three jobs that Mr. Winkel could perform under both the light and sedentary exertional levels with their corresponding "national numbers" [R. 72-73]. The vocational expert reported that the numbers she provided were consistent with the Dictionary of

Occupational Titles (DOT) and the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO) and supplemented by her "25+ years of experience as a licensed vocational consultant doing job placement, labor market surveys, and job site analyses" [R. 73].

To find a claimant not disabled, an ALJ must find that work exists "in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives." 42 U.S.C. § 423(d)(2)(A). Work that is "in the national economy" is defined as "work which exists in significant numbers either in the region where [the claimant] lives or in several regions of the country." *Id.*

This circuit has offered guidance on the meaning of "national economy." *Compare Alaura v. Colvin*, 797 F.3d 503, 507 (7th Cir. 2015) ("if there is a significant number of jobs that the applicant for benefits can perform anywhere in the United States he is deemed not disabled") *and Herrmann v. Colvin*, 772 F.3d 1110, 1114 (7th Cir. 2014) ("if there is a substantial number of such jobs in the nation, the applicant's claim fails, no matter how few there are in his locality or region") *with Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) ("test [of the plaintiff's entitlement to disability benefits] is whether she is so disabled that there are no jobs in reasonable proximity to where she lives that she is physically able to do"). That guidance has legitimately resulted in some mixed messages at the district level. *Compare Dorothy B. v. Berryhill*, 2019 U.S. Dist. LEXIS 91276, 19-20 (N.D. Ill. May 31, 2019) (finding an ALJ can solely rely on jobs available in the national economy) (citing *Alaura*, 797 F.3d at 507) *with Yvonne S. v. Berryhill*, 2019 U.S. Dist. LEXIS 147932, 35-38 (N.D. Ind. Aug. 30, 2019) (finding the proposition that an ALJ can permissibly rely solely on national numbers "antithetical to a plain reading of the statute") (relying on *Barrett*, 355 F.3d at 1067).

In this case, the vocational expert provided national numbers. Whether the ALJ was entitled to rely on national numbers alone is irrelevant because the claimant's counsel failed to object to the vocational expert's reference to national numbers or challenge the vocational expert's reasoning and

methodology in arriving at these numbers. Such a failure constituted a waiver of any objection to the vocational expert's testimony. *See Coyier v. Saul*, 2021 U.S. App. LEXIS 15928, 5 (7th Cir. May 27, 2021) ("Because counsel failed to develop an argument or question the VE any further about his methodology, the ALJ was entitled to rely on the job-number estimates."); *Mitchell v. Kilolo Kijakazi*, 2021 U.S. App. LEXIS 21697, 9-10 (7th Cir. July 22, 2021) (explaining that the ALJ was entitled to rely on the VE's opinion when the claimant "never challenged the expert's experience or knowledge as an adequate foundation for her testimony"). The demands on an ALJ are different when the claimant is proceeding *pro se*, in which case, "the ALJ is required to supplement the record, as necessary, by asking detailed questions." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009); *see also Rennaker v. Saul*, 820 F. Appx. 474, 479 (7th Cir. 2020) ("[the duty to develop a full and fair record] is enhanced when [sic] a disability benefits claimant is unrepresented").

Mr. Winkel was not acting *pro se*. He had the benefit of counsel. It was counsel's obligation to challenge the vocational expert's testimony and reliance on national numbers during the hearing or in a post-hearing brief. By not doing so, Mr. Winkel waived any objection to the vocational expert's testimony, and it was reasonable for the ALJ to rely on such testimony, as it was, without developing the record through additional questioning. The ALJ had no reason to believe that the occupations cited by the vocational expert were "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [Mr. Winkel] live[s]." 20 C.F.R. § 404.1566(b). This finding doesn't undo the other errors that require remand.

CONCLUSION

Accordingly, the court GRANTS Mr. Winkel's request for remand [ECF 12] and REMANDS the Commissioner's decision for consideration in light of this ruling.

SO ORDERED.

October 27, 2021                                  *s/ Damon R. Leichty*
                                                 Judge, United States District Court